UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


Patricia Stanley,                                          Case No. 3:12CV2741

    Plaintiff,

  v.                                               MEMORANDUM OPINION
                 AND ORDER

Northwest Ohio Psychiatric Hospital,

    Defendant.


  Patricia Stanley filed her civil rights action against Northwest Ohio Psychiatric Hospital

pursuant to 42 U.S.C. § 2000e (Title VII).  The hospital has moved for summary judgment pursuant

to Federal Rule of Civil Procedure 56(a).  (Doc. 40).  Stanley has filed a response (Doc. 46) and the

hospital has filed a reply.  (Doc. 47).

### I.  Jurisdiction and Venue

  The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.  Venue is properly

before this Court under 28 U.S.C. § 1391 and N.D. Ohio R. 3.8.

### II.  Facts

  The undisputed facts establish Patricia Stanley is a former therapeutic program worker for

the Northwest Ohio Psychiatric Hospital located in Toledo, Ohio.  Stanley worked for the hospital

from May 24, 2010, until she resigned on November 27, 2012.  This case involves an inexcusable

event which occurred between Stanley and Robert Ackerman at approximately 6:00 a.m. on August

25, 2011, in the hospital.

  The hospital is a state psychiatric facility operated by the Ohio Department of Mental Health

1

and Addiction Services (department).  The facility has two human resource employees:  Lois Mason-Williams, who is the director, and Rachel Watson, who is Mason-Williams's subordinate.  The final decision-making power concerning discipline lies with the hospital's Appointing Authority, Chief Executive Officer Dr. Mychail Scheramic, who was the CEO of the hospital at the time of the incident.

The hospital maintains its own police force, headed by Chief Richard Bingham.  The police officers possess arrest powers, but refer criminal activities to the Ohio State Highway Patrol, who have the first right of refusal on criminal matters.  The hospital police conduct administrative investigations and investigate employee and patient complaints.  At the time of the incident, Officers David Rocco and Kyle Hodge were assigned to the shift in question.

Robert Ackerman worked at the hospital from May 6, 1991, until he resigned.  I note there is a conflict in the evidence regarding Ackerman's resignation date.  Ackerman's employment record reflects an August 29, 2011 date, while several other documents reflect an August 31, 2011 resignation date.  This conflict is immaterial to the disposition of this case.  Ackerman was a ward nurse for five years and worked as a nurse supervisor for the remaining  years of his employment.

Stanley began working at the hospital on May 24, 2010, as a therapeutic program worker.  Stanley was assigned to the third shift, which was from 11:00 p.m. until 7:30 a.m.  As a therapeutic program worker, Stanley assisted patients with their care and documented the care provided in patient notes.

When Stanley began working at the hospital, she underwent orientation.  During her second day of employment, Stanley received an "EEO Overview" conducted by former training officer Tom Ohns, which concerned several topics including sexual harassment.  Although the department maintains a separate sexual harassment policy, Stanley does not remember receiving this policy.  The

hospital is permitted to maintain separate policies so long as the facility meets the minimum guidelines set forth by the department.  Stanley believes the hospital's sexual harassment policy was distributed to her after the Ackerman incident.

Despite the training and policies, sexual discussions were common on the third shift and Stanley admits to engaging in such talk.  "I felt comfortable enough to," Stanley conceded.  Other hospital employees attested hearing Stanley having sexual discussions.

The hospital requires two therapeutic workers to be assigned to each unit per shift.  At the time of the incident, Stanley and therapeutic worker Rindy Crosby were assigned to Unit 400.  At least one registered nurse was required to be at each unit per shift.  Dennis Rodgers and Laurie Grant were the registered nurses assigned to Unit 400 on the night of the incident.  The registered nurses reported to third shift Nursing Supervisors Robert Ackerman and Mary Hampton.  Ackerman and Hampton reported to one of two Clinical Nurse Managers, who reported to Director of Nursing Kathy Anthony, who reported to CEO Scheramic.  Ackerman was the third shift supervisor the night of the incident; Hampton was not working.

Stanley's lawsuit is based strictly on the August 25, 2011 incident.  She has not raised any sexual harassment concerns with any hospital employee prior to the incident.  Stanley testified she had not heard Ackerman make any inappropriate sexual comments to other employees prior to the incident.

Stanley thought Ackerman was "cool" and an "all right" guy prior to the incident.  He never made any inappropriate comments towards her with the exception of inquiring about her brassiere size during the early part of her pregnancy in February/March 2011.  Stanley found the comment to be "weird," but did not report the comment or tell anyone about the remark.

Stanley gave birth on July 3, 2011.  The night of the incident was the first time she had seen

3

Ackerman since she had returned to work from maternity leave. When she started work at 11:00 p.m. on August 24, Stanley reported in at the supervisor's office. Ackerman asked her if her nipples had gotten darker. Stanley responded by saying, "Oh my gosh, Bob," and reported to her unit. Stanley does not recall anyone being present when Ackerman made this statement. The next time Stanley saw Ackerman was at approximately 6:00 a.m. on August 25.

Ackerman began talking to Stanley about her labor at the nurse's desk. Stanley was seated in a chair, with Crosby sitting to her right taking notes on a computer. Ackerman was sitting in a chair across from Stanley and Crosby. Rodgers was in the doctor's office, while Grant was at the nurse's station. Rodgers's view of the nurse's desk was obstructed and he did not witness the interaction between Ackerman and Stanley. Grant could see Ackerman and Stanley through the glass wall at the nurse's station. Grant did not hear or see anything inappropriate. Stanley describes this interaction as a twenty to thirty minute conversation regarding her childbirth, interspersed with questions and comments Stanley found offensive. Stanley testified "some of it was normal and then some of it was really gross."

The first thing Ackerman did during this conversation which Stanley found offensive was to grab her stomach and ask her something to the effect of "did the doctor forget one in there." Crosby scolded Ackerman for his actions. Later, Ackerman asked if Stanley had stretch marks, and if so, if they were red or white. Stanley redirected the question to Crosby, and said, "Why don't you ask Rindy? She has three kids." Ackerman next asked her, "Do you still get wet down there now?"

Ackerman then asked Stanley if her breasts had gotten larger. Stanley responded, "I don't know." Ackerman said, "I have a way of checking," stood up behind Stanley as she was seated and grabbed her right breast. Stanley looked at Crosby and asked her, "Did you see what Bob just did to me?" Crosby responded by throwing her hands in the air and shaking her head. Crosby did not see

4

Ackerman's hand contact Stanley's breast, but did view his hand moving away from her chest.

Ackerman immediately left the area and went to the doctor's office where Rodgers was working.  Ackerman was in the doctor's office for a few seconds and then left the unit.  After Ackerman left, Stanley went to the doctor's office and explained to Rodgers what had happened.  Rodgers began obtaining information regarding the incident.  Rodgers asked Stanley if she needed to go to the hospital, which she declined.  Rodgers offered to contact third shift Police Officer David Rocco, or the administrator on call.  Stanley declined as she wanted some time to think about what had transpired.  Rodgers offered to walk Stanley to her car, which she declined.  After reporting the incident to Rodgers, she talked to Grant, who allegedly "snickered" in response.  Stanley's shift ended and she called her mother and sister on her way home from work to discuss the situation. Stanley recalls consulting the hospital's sexual harassment policy after the incident.

Stanley reported the incident at the beginning of her next shift at 11:00 p.m. on August 25 to Nursing Supervisor Mary Hampton.  Prior to Stanley's report, Hampton testified she had never received any reports of any sexually inappropriate behavior from female employees about Ackerman.  In response, Hampton contacted third shift Police Officer Kyle Hodge.  Hodge testified he had never previously investigated Ackerman, had never received any reports of Ackerman engaging in inappropriate sexual behavior, had never heard Ackerman make any sexual comments, and no employee had approached him after the incident to complain of Ackerman engaging in similar behavior.  Hodge's report reflects he received Hampton's call at 3:50 a.m. on August 26. Stanley provided a statement she prepared to Officer Hodge and Hampton, which Officer Hodge then transposed onto a statement form.  Hodge interviewed Stanley at 4:45 a.m. on August 26. Officer Hodge obtained a statement from Hampton at 5:15 a.m. and a statement from Grant at 5:40 a.m.

Hampton reported the incident to Kathy Anthony when Anthony reported to work on August 26.  Hodge turned his initial findings over to Chief Bingham.  Hodge considered the incident to be a "big case," and "had to be taken care of in a swift manner."

After Stanley returned home on August 26, she had a telephone conversation with Equal Employment Opportunity Officer Rachel Watson.  Watson wanted to determine how Stanley was doing physically and emotionally and if there was something she could do for her.  She offered Stanley assistance through the Employee Assistance Program, and scheduled an in-person meeting for Monday, August 29th.  Watson informed Stanley during their conversation that Ackerman had been moved to first shift so she would not have to work with him.  Ackerman never worked this shift as he resigned during the pendency of the investigation.

On August 26, 2011 at 11:07 a.m., Chief Bingham sent an email entitled "Major Notification" to the department's Security Consultant Nacrina Alvarez de Blanco, EEO Administrator LaToya King, Human Resources Office Chief Anne Thomson, former Employment Law Counsel Geoff Callander, Chief Legal Counsel Michaela Peterson, and hospital CEO Schermaic.  In this email, Chief Bingham described the incident based on Stanley's report and advised that Ackerman had been placed on day shift and an investigation was underway.  Further, he also indicated the state police had been notified of the incident via telephone.  At 2:42 p.m., Chief Bingham received notification via email the state police would be conducting a criminal investigation into the incident.  The first thing Mason-Williams did when she learned of the incident on the 26th was make similar notifications.  The department maintained a policy entitled "Procedures for Handling Suspected Illegal Activities and Employee Wrongdoing," which contains a section governing reporting and investigative procedures.  Ackerman's conduct was subject to this policy and the policy-mandated reporting/investigative procedures were followed according to Mason-

Williams.

After Hodge passed his initial findings onto Chief Bingham, Chief Bingham oversaw and continued the internal investigation.  Chief Bingham interviewed and obtained statements from Crosby and Rodgers.  Chief Bingham also questioned a patient who was on the unit at the time of the incident.

On Monday, August 29th, Stanley met with Watson for approximately twenty minutes. Watson provided Stanley with an Employee Assistance Program pamphlet.  Stanley did not contact the Employee Assistance Program because she utilized a personal counselor.  Watson also explained Stanley's charge filing options to her, including the option to file an internal charge of discrimination with the Ohio Department of Administrative Services Equal Employment Opportunity Division and the external charge option with the Ohio Civil Rights Commission or the Equal Employment Opportunity Commission, or both.  Stanley completed the internal charge form, along with a more detailed factual narrative in Watson's presence.

After the meeting, Watson contacted LaToya King, the department's EEO Administrator, who serves as a resource for Watson on EEO issues.  King instructed Watson to begin collecting statements in order to respond to Stanley's charge.  On August 30, Watson sent a letter to Stanley informing her the charge had been accepted and an investigation would be conducted as expeditiously as possible.  The letter also explained the complaint procedure and reiterated her charge filing options.

The state police visited the hospital on August 29 to collect information.  The state police returned on August 31 to interview Stanley and witnesses to the incident.

Ackerman resigned his position on August 31.  Because Ackerman was no longer employed by the hospital, Chief Bingham closed the case.  The state police, however, continued to pursue its

criminal investigation against Ackerman.  Chief Bingham also sent an email to all hospital police officers instructing them that Ackerman was not to be on hospital grounds and any sightings of Ackerman were to be documented and reported.

On September 19, 2011, the state police informed Stanley that Ackerman had been charged with sexual imposition.  Stanley never saw Ackerman until his criminal trial.

On October 14, 2011, Watson sent Stanley a letter informing her a no probable cause finding had been made regarding her internal charge.  Stanley was informed of her right to request a hearing before the Ohio Department of Administrative Services.  Stanley chose not to request a hearing.  Stanley filed a charge of discrimination with the Ohio Civil Rights Commission on October 19, 2011.  Because Stanley did not request a hearing, the Ohio Department of Administrative Services closed her internal case on November 23, 2011.  During the hospital's investigation into Stanley's co-worker complaints, Mason-Williams advised her to seek a temporary restraining order against Ackerman.  Stanley chose not to seek such relief.

Ackerman's criminal trial was held on February 7, 2012, and he was convicted of sexual imposition.  Registered Nurses Rasa Espen, Laurie Grant, and Kathy McDonald testified on Ackerman's behalf.  Grant moved to second shift one day after the trial and Stanley never worked with her again.  Espen worked a different shift.  Stanley worked with McDonald only one or two times after a September 2011 incident where McDonald claimed Stanley had falsely accused Ackerman of sexual harassment.  Stanley admitted that tension existed between herself and McDonald because McDonald had testified on Ackerman's behalf.  Stanley stated in her deposition she "had a few choice . . . words" she would have liked to say to McDonald, but did not do so.

On October 26, 2012, Stanley took stress leave.  On November 21, she applied for mental health disability retirement benefits through the Ohio Department of Administrative Services.  Her

request was denied.  Stanley did not return to the hospital.  Stanley submitted her resignation to Watson on November 27, 2012.  Watson encouraged Stanley to have her disability leave extended as opposed to resigning, but the suggestion was to no avail.

On October 19, 2011, Stanley filed a charge of sexual harassment with the Ohio Civil Rights Commission regarding the Ackerman incident.  On March 15, 2012, Commission  Employment Investigator Marcena Upp sent an email to Stanley and her attorney indicating the investigation was complete and "there is insufficient documentation for a probable cause recommendation," because the hospital "took prompt remedial action . . . ."  Stanley was issued her right to sue letter on April 26, 2012.  Stanley then filed her current Title VII action on November 2, 2012.

The uncontested evidence further establishes prior to his illegal conduct towards Stanley, Ackerman had a lengthy disciplinary record.  In August 1995, Ackerman was charged with an allegation of patient abuse and/or neglect and/or neglect of duty.  No documents regarding the outcome on this incident appear to exist.  In October 1995, Ackerman was referenced in an incident report for allegedly threatening to abuse two patients.  Ackerman was accused of telling one patient he would "kick his ass & put him in restraints."  Ackerman allegedly told the second patient he would "kick his ass" and "would get staff to come in and jump on him."  In November, the hospital informed Ackerman the matter was closed.

In May 1996, Ackerman was investigated for sexually inappropriate behavior towards a patient.  The joint exhibit in the record does not disclose the facts or basis for the investigation.  A few weeks later the hospital closed the case.  In July 1996, Ackerman was investigated for failing to initiate a fifteen minute observation for a patient.  Again, no documents regarding the outcome of this incident appear to exist.

On November 2, 1999, Ackerman was issued a written reprimand for neglect of duty.  In

April 2000, Ackerman was issued a two day suspension for insubordination.  The suspension was issued because Ackerman "failed to follow a directive from [his] supervisor to refrain from involving [himself] in [his] wife's work-related issues."

On February 21, 2001, Ackerman sent an email to a first shift nurse which "was perceived as sarcastic, threatening, inappropriate and unprofessional."  The gender of the nurse who received the email and the contents of the email are not identified in the joint exhibit filed with the Court.  As a result of this incident, Ackerman received a suspension.

In 2002, Ackerman was charged with failure of good behavior for incidents occurring in January and April.  In the January incident, Ackerman allegedly had a conversation with a co-worker in which he explained he wished the entire African race were killed off the face of the earth.

In the April incident, Ackerman allegedly approached a co-worker/subordinate in a threatening manner.  Ackerman was accused of walking past a Ms. Boyd, who was standing with three of her co-workers.  Ackerman "said something to the effect 'how are you doing,' whereupon Ms. Boyd responded 'good' and Mr. Ackerman then replied 'I hope you stay that way.'"  The report states a witness noted Ms. Boyd and Ackerman "were smiling during this exchange."  In the comments section of the notes from the pre-disciplinary conference, held on May 17, 2002, hearing officer Terry Smith wrote:

> Mr. Ackerman has had a checkered past as noted by discipline given him over the last three years.  The investigation surrounding these latest allegations don't leave me with overwhelming belief of blatant policy violation.  I do believe he was "[sic] inappropriate with his comments to Ms. Boyd and I believe she was left feeling threatened.  Mr. Ackerman is a manager and as such he should be setting example for others with his actions and behaviors.  His discipline record is sending the wrong message.

Although Ackerman was recommended for removal from his employment, the removal was held in abeyance and he was given the option to complete an employee assistance program in exchange for

10

the recommended discipline being reconsidered and reduced.

Ackerman returned to his position after completing the assistance program, but in August 2004, was again accused of inappropriate behavior and patient abuse. On August 18, Carolyn Ward filed an incident report after Ackerman insisted on taking a patient to get ice water in a room where the door automatically shut. After an investigation, Ackerman served a two-day suspension.

In November 2008, Ackerman was required to serve a two-day suspension as a result of using poor judgment and performing as a supervisor at a substandard level by distributing inappropriate news material to staff members on the third shift. The article, located on WTOL.com, was dated September 11, 2008, and was entitled *Grad student auctioning her virginity for tuition*.

In 2007, Ackerman sent an email to pharmacist Martha Meeker in which he told her he was happy for her regarding her recent marriage, but was also somewhat depressed because he had wanted her to have his baby. Meeker had no prior interaction, either at work or personally, with Ackerman. She reported the incident to human resources and filed a formal, internal complaint of sexual harassment. During the investigation of this complaint, Ackerman was asked, "Did you give consideration to the idea that Ms. Meeker would perceive the content of your e-mail to be inappropriate or sexually harassing in nature?" Ackerman responded, "Of course not. I felt the communication was appropriate, slightly humorous, but certainly not coarse, profane or insulting. I was floored I was taken as anything less than lighthearted." Meeker was sent a letter ordering her not to initiate any contact with Ackerman, to contact police if she needed assistance with Ackerman, and there should be no face-to-face communication between her and Ackerman. Meeker testified she felt like she was being viewed as a problem, not as a victim.

In July 2009, Ackerman received another two-day suspension, reduced from a five-day suspension, for neglect of duty and using poor judgment. The suspension was a result of an incident

11

report that Ackerman wrote stating the hospital was an unsafe work environment and had insufficient staff to respond to emergencies. Ackerman failed to submit his report to the proper supervisor. Ackerman also responded to an email from a supervisor "in an unprofessional inappropriate manner", while sending the response to several nursing department employees and a physician.

### III. Summary Judgment Standard

Summary judgment is proper where "there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting a genuine issue of material fact must support the argument either by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). A court views the facts in the record and reasonable inferences which can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). A court does not weigh the evidence or determines the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

The party requesting summary judgment bears an initial burden of demonstrating no genuine issue of material fact exists, which the party must discharge by producing evidence to demonstrate the absence of a genuine issue of material fact or "by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25 (1986) (internal quotation marks omitted). If the moving party satisfies this burden, the nonmoving party "may not rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren,* 578 F.3d 351, 374 (6th Cir. 2009) (citing Rule

56 and *Matsushita,* 475 U.S. at 586).  The party opposing the summary judgment motion must

present sufficient probative evidence supporting its claim that disputes over material facts remain;

evidence which is "merely colorable" or "not significantly probative" is insufficient.  *Anderson,* 477

U.S. at 248–52.

## IV.  Discussion

Stanley argues her sexual harassment claims must survive the hospital's motion for summary

judgment because genuine issues of material fact exist to prevent the grant of summary judgment to

the hospital.  Stanley claims the hospital is strictly liable because Ackerman's responsibilities at the

hospital made him a supervisor.  She also argues even if Ackerman is not considered a supervisor,

the hospital is still responsible under a co-worker harassment theory.  Finally, Stanley asserts

Ackerman's actions created a work environment so severe as to establish a cause of action and the

hospital's prompt and remedial response does not allow the hospital to avoid liability.

### A.  Supervisor

The initial question which must be addressed is whether Ackerman can be considered a

"supervisor."  The answer to this question is important in determining whether the hospital can be

considered strictly liable for Ackerman's actions.  The issue was recently addressed by the Supreme

Court of the United States in *Vance v. Ball State Univ.*, 133 S. Ct. 2434 (2013).  In *Vance*, the Court

stated:

> Under Title VII, an employer's liability for such harassment may depend on
> the status of the harasser.  If the harassing employee is the victim's co-worker, the
> employer is liable only if it was negligent in controlling working conditions.  In cases
> in which the harasser is a "supervisor," however, different rules apply.  If the
> supervisor's harassment culminates in a tangible employment action, the employer is
> strictly liable.  But if no tangible employment action is taken, the employer may
> escape liability by establishing, as an affirmative defense, that (1) the employer
> exercised reasonable care to prevent and correct any harassing behavior and (2) that
> the plaintiff unreasonably failed to take advantage of the preventive or corrective

opportunities that the employer provided. [*Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1988)]; [*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 775, 765 (1998). Under this framework, therefore, it matters whether a harasser is a "supervisor" or simply a co-worker.

*Vance*, 133 S. Ct. at 2439.

The Court held "an employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." *Id.* In discussing how courts are to determine whether an individual is a supervisor, the Court stated:

> We hold that an employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, i.e., to effect a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, *supra*, at 761, 118 S. Ct. 2257.

*Id.* at 2443.

The Court further explained:

> As *Ellerth* recognized, however, "most workplace tortfeasors are aided in accomplishing their tortious objective by the existence of the agency relation," and consequently "something more" is required in order to warrant vicarious liability. 524 U.S., at 760, 118 S. Ct. 2257. The ability to direct another employee's tasks is simply not sufficient. Employees with such powers are certainly capable of creating intolerable work environments, see *post*, at 2459 – 2460 (discussing examples), but so are many other co-workers. Negligence provides the better framework for evaluating an employer's liability when a harassing employee lacks the power to take tangible employment actions.
> . . . .
> To begin, there is no hint in either *Ellerth* or *Faragher* that the Court contemplated anything other than a unitary category of supervisors, namely, those possessing the authority to effect a tangible change in a victim's terms or conditions of employment. The *Ellerth*/*Faragher* framework draws a sharp line between co-workers and supervisors. Co-workers, the Court noted, "can inflict psychological injuries" by creating a hostile work environment, but they "cannot dock another's pay, nor can one co-worker demote another." *Ellerth*, 524 U.S., at 762, 118 S. Ct. 2257. Only a supervisor has the power to cause "direct economic harm" by taking a tangible employment action. *Ibid.* "Tangible employment actions fall within the special

14

province of the supervisor.  The supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control. . . .  Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates."  *Ibid.* (emphasis added).  The strong implication of this passage is that the authority to take tangible employment actions is the defining characteristic of a supervisor, not simply a characteristic of a subset of an ill-defined class of employees who qualify as supervisors.

*Id.* at 2447–48.

To date the Sixth Circuit has yet to discuss what constitutes a supervisor in light of *Vance.  See Waldo v. Consumers Energy Co.*, 726 F.3d 802, 813 n.2 (6th Cir. 2013) (simply stating "[t]he standards for holding an employer liable under Title VII differ depending on whether the hostile work environment was created by an employee's co-workers or by a supervisor.").  I must therefore examine the duties Ackerman possessed in order to determine whether he is a supervisor under the definition set forth in *Vance.*

The hospital contends Ackerman was three managerial levels removed from CEO Scheramic, who the hospital contends is the sole supervisor of the facility.  Ackerman was a psychiatric/nurse supervisor.  He had the ability to bring potential disciplinary problems to the attention of the hospital's human resource manager.  Mason-Williams, the current human resource manager, testified she also had the authority to hire, discipline, and terminate employees.  In his role as a psychiatric/nurse supervisor, Ackerman prepared disciplinary packets, including fact-finding statements, time and attendance records, and other applicable records and documents.  The record also shows Ackerman had the authority to send subordinates home as a disciplinary measure, conduct performance evaluations, have an input into final disciplinary actions, and attend disciplinary hearings.

Stanley insists a genuine issue of material fact exists as to whether or not Ackerman

15

possessed the requisite supervisory authority discussed in *Vance*. But *Vance* makes clear the Court's definition of supervisor is "generally . . . capable of resolution at summary judgment." *Vance*, 133 S. Ct. at 2449. The facts allow for such a resolution in this case.

*Vance* describes a supervisor as an individual empowered by an employer who can "take tangible employment actions against the victim, *i.e.*, to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 2443 (internal quotation marks and citation omitted). Ackerman's responsibilities, which Stanley herself describes in her opposition to the motion for summary judgment (Doc. 46, pp. 11–13), do not meet *Vance's* definition of "supervisor." Ackerman did not have the authority to hire, fire, deny promotions, reassign an employee with significant different responsibilities, or cause a significant change in benefits. Although Ackerman could *begin* a disciplinary process, the ultimate responsibility regarding disciplinary matters belonged to individuals with higher authority. Accordingly, I find Ackerman was not a supervisor and the hospital is not strictly liable for Ackerman's actions. *Id.* at 2439.

### B. *Hostile Work Environment*

Stanley argues even if Ackerman is not considered a supervisor under *Vance*, the hospital is still liable because its negligence lead to a hostile work environment. Stanley specifically refers to Ackerman's extensive disciplinary history at work to support her position that a hostile work environment existed at the hospital. The Supreme Court acknowledged such liability in *Vance*. *Id.* at 2452.

To establish a prima facie claim of a sexually hostile work environment under Title VII, a plaintiff must show by a preponderance of the evidence: "(1) that she was a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based

16

on sex; (4) that the harassment unreasonably interfered with her work performance by creating a hostile, offensive, or intimidating work environment; and (5) that there is a basis for employer liability." *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 455 (6th Cir. 2008) (citation omitted).  To meet the fourth requirement, the harassing conduct must be "severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive."  *Id.* (internal quotation marks and citation omitted).

Conduct need not be both severe and pervasive to constitute a hostile environment, but may be either sufficiently severe or sufficiently pervasive.  *See Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 717 n.2 (6th Cir. 2012).  Comments and conduct need not be directed at the plaintiff to be sufficiently severe or pervasive to constitute a hostile environment.  *See Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997).  Where a court finds, however, the comments were not directed at the plaintiff, a court weighs against a finding of an objectively hostile environment.  *See id.*

I must consider "harassment by all perpetrators combined when analyzing whether a plaintiff has alleged the existence of a hostile work environment."  *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999).  This includes "all incidents of alleged harassment" regardless of whether the harasser is an employer or a co-worker.  *See id.* at 562–63.  Only when determining employer liability, the fifth element of the prima facie case, may I "conduct separate analyses based on the identity of the harasser."  *Id.* at 562.

"The determination of whether harassing conduct is sufficiently severe or pervasive to establish a hostile work environment is not susceptible to a mathematically precise test."  *Hawkins v. Anheuser–Busch, Inc.,* 517 F.3d 321, 333 (6th Cir. 2008) (internal quotation marks and citation omitted).  I must examine "all the circumstances," including "the frequency of the discriminatory

17

conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).  "The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive.  But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required."  *Id.*

"Even after a hostile work environment has been established, '[f]or an employer to be liable for the sexual harassment of an employee by a coworker, the harassed employee must show that the employer both (1) knew or should have known of the harassment and (2) failed to take prompt and appropriate corrective action.'"  *McCombs v. Meijer, Inc.*, 395 F.3d 346, 353 (6th Cir. 2005) (quoting *EEOC v. Harbert–Yeargin, Inc.*, 266 F.3d 498, 518 (6th Cir. 2001)).

The hospital concedes Stanley has satisfied the first three elements of a prima facie hostile work environment claim.  (Doc. 40, p. 17).  Because I find Stanley has not satisfied the fifth element of a hostile work environment claim, i.e., "there is a basis for employer liability," *Thornton*, 530 F.3d at 455, the hospital is entitled to summary judgment as a matter of law.

Stanley's hostile work environment allegation consists of two distinct events.  The first concerns Ackerman's actions against Stanley.  The second concerns the treatment Stanley received from her co-workers after Ackerman's actions were reported to hospital officials.  Each event will be separately examined.

### 1.  *Ackerman's harassment*

For the hospital to be liable under Title VII, Stanley must establish the hospital knew or should have known of the harassment *and* failed to take prompt and appropriate corrective action. *McCombs*, 395 F.3d at 353.  Stanley cites Ackerman's lengthy disciplinary history, including two

18

complaints for inappropriate sexual misconduct, to support her claim.  Stanley concedes that when
the hospital became a separate entity in 2009, Ackerman's disciplinary records remained with the
prior corporation.  Stanley argues, however, just because the State of Ohio chose to reorganized its
public mental health services did not excuse the hospital from maintaining and preserving the prior
employment records of its employees.  (Doc. 46, p. 17).  Stanley states it was unreasonable for the
hospital's human resource manager to be unaware of Ackerman's prior disciplinary issues.  Stanley
states Ackerman's prior conduct establishes his actions against Stanley were foreseeable.

     I do not agree that Ackerman's prior conduct would make his actions against Stanley
foreseeable.  Only two of Ackerman's prior misconduct actions were of a sexual nature and both
were years before the Stanley incident.  Neither incident would give any indication Ackerman would
physically grope a female employee.

     The record establishes prior to her pregnancy, Stanley thought Ackerman was "cool" and an
"all right" guy.  It was not until February or March of 2011, while she was pregnant, that Ackerman
made an inappropriate comment concerning Stanley's brassiere size.  Stanley admitted she thought
the comment was weird, but failed to report the comment to hospital authorities.  Because
Ackerman had made no previous inappropriate comment or action towards Stanley, the hospital
could not have anticipated this inappropriate comment.  In addition, because Stanley failed to report
the incident, the hospital was unable to take prompt and appropriate corrective action.  *McCombs*,
395 F.3d at 353.  Therefore, because the hospital was not given notification of this incident so it
could take corrective action, under *McCombs*, I conclude Stanley has failed to establish a hostile work
environment claim as to this incident.

     Regarding the events of August 24 and 25, the record establishes as soon as Stanley reported
the incident to a hospital supervisor, the hospital took immediate action to resolve the situation,

including notifying the appropriate law enforcement authorities.  These steps ultimately led to Ackerman's arrest and conviction for sexual imposition, a conviction which was upheld on appeal. *Toledo v. Ackerman*, No. L-12-1123, 2013 WL 3356824, at *1 (Ohio Ct. App. June 28, 2013).  Because the hospital authorities took immediate action regarding Ackerman's criminal conduct when they were notified, the hospital is not liable for a Title VII action regarding Ackerman's conduct towards Stanley.  *McCombs*, 395 F.3d at 353.

Although not mentioned in her brief opposing the motion for summary judgment, the hospital notes Stanley had testified to four other events where Ackerman allegedly engaged in harassing and inappropriate conduct.  (Doc. 40, pp. 21–24).  Stanley stated she learned of these incidents from Ackerman's former wife.  These incidents were found by the parties to be false rumors.  The two women who were allegedly sexually harassed by Ackerman denied the incidents occurred.  The third incident regarding an allegation of patient assault was investigated by the hospital.  Ackerman was found not to have sexually assaulted the patient.  The final incident allegedly involved a nurse, a cucumber, and sexual innuendo.  Stanley testified she was unaware of this alleged incident.  Thus, these allegations do not support any claim the hospital knew or should have known Ackerman would grope Stanley.

### 2. Post-Ackerman Incidents

Stanley contends she is not only a victim of Ackerman, but also of post-incidents involving her co-workers.  Stanley states the actions of her co-workers contributed to the hostility by creating a constant and rapidly deteriorating work environment.  Specifically, Stanley states she was the subject of several rumors, was isolated by her co-workers, and "never again felt comfortable at work."  (Doc. 46, p. 18).  One incident occurred on the night shift of September 14, 2011, when Kathy McDonald confronted Stanley, accusing her of costing Ackerman his job by falsely claiming

20

sexual harassment.  Stanley reported the incident to her union representative.

The second incident occurred on December 18, 2011, when McDonald, and three other co-workers, again accused Stanley of making false allegations against Ackerman.  Stanley reported the incident to Officer T. Jones of the hospital police on December 21, 2011.  The report resulted in an investigation by the hospital.  (Doc. 35–1, pp. 5–6).

Stanley's confrontations with her co-workers do not establish a Title VII hostile work environment claim.  A hostile work environment occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (internal quotation marks and citations omitted).  Both an objective and a subjective test must be met:  the conduct must be severe or pervasive enough to create an environment which a reasonable person would find hostile or abusive and the victim must subjectively regard the environment as abusive.  *See id.* at 21–22.

Non-sexual conduct, such as what occurred in this case with Stanley's co-workers, may be illegally sex-based and properly considered in a hostile environment analysis where it can be shown that but for the employee's sex, she would not have been the object of harassment.  *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000).  "Any unequal treatment of an employee that would not occur but for the employee's gender may, if sufficiently severe or pervasive under the *Harris* standard, constitute a hostile environment in violation of Title VII."  *Id.* (internal quotation marks and citation omitted).  "However, 'Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat [ion] . . . because of . . . sex.'"  *Id.* (quoting *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 80 (1998) (emphasis in original)).  "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to

disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale*, 523 U.S. at 80 (citation omitted); *Bowman*, 220 F.3d at 463–64.  The confrontations which Stanley had with her co-workers were completely unrelated to her sex. Therefore, these incidents do not establish a Title VII violation.  *Oncale*, 523 U.S. at 80; *Bowman*, 220 F.3d at 463–64.

V.  Conclusion

Accordingly, for the previously stated reasons, Northwest Ohio Psychiatric Hospital's motion for summary judgment (Doc. 40) is granted.

So Ordered.

  s/ *Jeffrey J. Helmick*
United States District Judge
